# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CASE NO. 5:23-cv-00055-MR

| | |
|---|---|
| **RONALD JASON GIBSON,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **LESLIE COOLEY DISMUKES,** ) | |
| **Secretary, North Carolina** ) | |
| **Department of Adult Correction,** ) | |
| ) | |
| **Respondent.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Petitioner's Motion To Alter or Amend Judgment pursuant to Fed. R. Civ. P. 59(e). [Doc. 17].

## I.    BACKGROUND

Ronald Jason Gibson (herein "Petitioner") is a prisoner of the State of North Carolina. [Doc. 1 at 1]. The Petitioner was charged in Iredell County with felony hit and run resulting in death, felony hit and run resulting in serious injury, aggressive driving, reckless driving, and attaining the status of habitual felon. [Doc. 9-3 at 9]. The matter was tried before a jury on August 5, 2019, in Iredell County Superior Court. The jury convicted the Petitioner on both counts of felony hit and run and the count of reckless driving. [Id.].

The jury acquitted him on the charge of aggressive driving. Thereafter, the Petitioner pleaded guilty to having attained the status of habitual felon. [Id.].

On August 12, 2019, the state trial court imposed a presumptive sentence of 83 months to 112 months in prison for one conviction of felony hit and run and a consecutive, presumptive sentence of 83 to 112 months in prison for the other conviction of felony hit and run. [Doc 9-2 at pp. 2-5]. The Petitioner timely gave oral notice of appeal. [Doc. 9-3 at 9].

After pursuing his direct appeal and then engaging in post-conviction collateral litigation in the North Carolina courts,[1] the Petitioner filed his § 2254 petition in this Court on May 2, 2023, raising seventeen claims. [Doc. 1].  The Court entered an Order on October 12, 2023, directing the Respondent to respond to the § 2254 petition.  [Doc. 4].  The Respondent filed both an Answer to the § 2254 petition [Doc. 7] and a Motion for Summary Judgment on December 11, 2023.  [Doc. 8].  In support of her summary judgment motion, the Respondent submitted a brief along with exhibits from the Petitioner's state court proceedings.  [Doc. 9]. The Petitioner filed a Response in Opposition [Doc. 12] and accompanying Memorandum [Doc. 13] to the Respondent's summary judgment motion on January 16, 2024.

---

[1] The detailed procedural and factual history of this case is set forth at length in pages 1 through 12 of the Court's Memorandum of Decision and Order. [Doc. 15].

2

The Respondent filed a Reply to the Petitioner's opposition documents on January 23, 2024. [Doc. 14].

On September 29, 2025, the Court entered its Memorandum of Decision and Order (herein "Decision") in this matter granting the Respondent's Motion for Summary Judgment and dismissed the § 2254 petition. [Doc. 15]. On October 23, 2025, the Petitioner filed his Motion To Alter or Amend Judgment, pursuant to Federal Rule of Civil Procedure 59(e) [Doc. 17], and an accompanying Memorandum and exhibits in support thereof. [Doc. 18]. The Respondent filed her Response thereto with exhibits on November 3, 2025. [Doc. 19]. The Petitioner's Rule 59(e) motion is ripe for review.

## II. STANDARD OF REVIEW

A court has the discretion to alter or amend a judgment pursuant to a motion brought under Rule 59(e) no later than 28 days after entry of the judgment. Fed. R. Civ. P. 59(e). Such motions shall be granted only in very narrow circumstances: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; (3) to correct a clear error of law; or (4) to prevent manifest injustice. Hill v. Braxton, 277 F.3d 701, 708 (4th Cir. 2002) (citing Collison v. International Chemical Workers Union, 34 F.3d 233, 236 (4th Cir. 1994)). In the context of a federal

habeas proceeding, because a Rule 59(e) motion is "part and parcel" of the underlying action, its contents categorically cannot qualify as a successive petition. Banister v. Davis, 590 U.S. 504, 507 (2020). With that said, however, "courts will not address new arguments or evidence that the moving party could have raised before the decision issued." Id. at 508 (internal citation omitted).

## III. DISCUSSION

### A. The Petitioner's Rule 59(e) Motion

The Petitioner's Motion pertains to three particular grounds he raised in his § 2254 Petition (Grounds 3, 4 and 10). In its Decision, the Court dismissed these grounds under the doctrine of procedural default, in that the record before the Court did not show that these grounds had been preserved by the Petitioner in his proceedings before the North Carolina Court of Appeals. [Doc. 15 at pp. 30-32]. The Petitioner argues that the Court's Decision "overlooks certain key aspects of the state appellate court record which plainly reveal the error in this Court's ruling." [Doc. 18 at 2].

These three grounds were raised by the Petitioner in his post-conviction Motion for Appropriate Relief ("MAR") before the state trial court. [Doc. 9-10]. The state trial court denied the entirety of the Petitioner's MAR in its "Order of Summary Dismissal on Motion for Appropriate Relief" filed

November 8, 2022. [Doc. 9-15]. The Petitioner thereafter sought certiorari review in the North Carolina Court of Appeals. In what is now Ground 3 of his § 2254 petition, the Petitioner argued to the state appellate court that his trial counsel provided ineffective assistance to him during his sentencing hearing when she failed to present mitigation evidence. [Doc. 9-16 at pp. 53-6]. In what is now Ground 4, the Petitioner argued to the same court that his trial counsel provided ineffective assistance to him during trial when she failed to use photographic evidence to impeach one of the state's witnesses. [Doc. 9-16 at pp. 40-1]. And, in what is now Ground 10, the Petitioner argued to the same court that his trial counsel provided ineffective assistance to him during trial when she failed to cross examine a state's witness regarding his pretrial statements made to the prosecution. [Doc. 9-16 at pp. 44-5].

When asking the North Carolina Court of Appeals to reverse the trial court's adverse order denying his MAR, the Petitioner suggested the appellate court compare the record of the actions his attorney took during trial with the actions the Petitioner argued his counsel should have taken at that time to be effective. The Petitioner argued that such comparison would show that his trial attorney provided ineffective assistance to him, entitling him to a new trial. The Respondent, in her brief before the state court of appeals, argued that the court should dismiss the certiorari petition purely on

procedural grounds for noncompliance with the state rules of appellate procedure:

> Petitioner failed to attach the charging documents, judgment below, or transcript of the trial. <u>See</u> N.C. R. App. P. 21(c). And these are necessary documents to understand the "matters set forth in the petition." <u>See</u> <u>id.</u> For example, Petitioner challenges several pieces of (1) witness testimony, (2) closing arguments, and (3) jury instructions, yet failed to include a transcript of the trial which would contain such alleged errors. Given this noncompliance, this Court should dismiss the present petition.

[Doc. 9-17 at 4].

On April 28, 2023, the North Carolina Court of Appeals entered the following order in the Petitioner's case:

> By unanimous vote, the petition for writ of certiorari filed in this cause by petitioner Ronald Jason Gibson on 5 December 2022 is allowed in part for the limited purpose of vacating decretal provision #2 in the "Order of Summary Dismissal on Motion for Appropriate Relief" entered by Joseph N. Crosswhite on 8 November 2022, purporting to bar all future "claims, assertions, petitions, or motions that [petitioner] might hereafter file in this case[.]" See State v. Blake, 275 N.C. App. 699, 714 (2020). The petition is otherwise denied.

[Doc. 9-18 at 2].

In opposition to the Respondent's Motion for Summary Judgment before this Court, the Petitioner filed no forecast of evidence to rebut the Respondent's argument regarding the insufficiency of the record. Therefore, based on the record provided to this Court by the parties regarding their appellate litigation, the Court dismissed Grounds 3, 4, and 10 of the § 2254

6

petition under the doctrine of procedural default.  In its Decision, the Court

stated, in pertinent part, as follows:

> In order to preserve these issues, it was incumbent upon Petitioner to file a certified copy of the trial transcripts with the appellate court. Without the transcripts, the appellate court could not conduct the comparison Petitioner sought regarding Grounds 3, 4, and 10. The transcripts were essential. Without them, Petitioner had no foundation for his argument.
>
> Petitioner, however, failed to attach a certified copy of the trial transcripts to his appellate petition. As a result, the appellate court was effectively prevented from reviewing Grounds 3, 4, and 10, on the merits. Accordingly, it is inescapable that the Court of Appeals denied review of these claims based upon Petitioner's appellate rule violation. The Sixth Amendment issue that Petitioner presents here was never reached. The North Carolina Rules of Appellate Procedure are adequate and independent state law grounds to sustain the appellate court's decision. Therefore, Petitioner's Grounds 3, 4, and 10, shall be dismissed.

[Doc. 15 at pp. 31-32].

What was not brought to this Court's attention, however, prior to the

rendering of its Decision, was that the Petitioner had in fact filed the relevant

documents with the North Carolina Court of Appeals prior to its dismissal of

the Petitioner's Petition regarding these issues.

As the Petitioner now explains, he did not initially file the trial transcript

with his certiorari petition in the court of appeals, but he later "did, in fact, file

a certified copy of the trial transcript and the record on appeal" as a part of

his first motion to supplement the appendix to his petition.  [Doc. 17 at 2].

Notably, the Petitioner filed his first motion to supplement in the state appellate court two days *after* the Respondent filed her merits brief in the North Carolina Court of Appeals in opposition to his certiorari petition. [Doc. 19-3 at 3]. Therefore, in response to the Petitioner's belated motion to supplement the record, the Respondent observed:

> As a matter of equity, a litigant seeking to establish jurisdiction for an appeal should not be permitted to file a procedurally infirm petition, wait until the opposing party points out such procedural deficiencies, and then attempt to cure the now-highlighted issues via a motion to amend.

[Id. at 4]. Nevertheless, the appellate court granted the Petitioner's first motion to supplement the appendix. [Doc. 17-2].

The Petitioner now proclaims, "contrary to this Court's Order, Petitioner did not fail to file the trial transcript as required by the appellate rules, and the Court of Appeals had the trial transcript before it in making its ruling on the merits of Petitioner's PWC and was not 'effectively prevented from reviewing Grounds 3, 4 and 10 on the merits.' " [Doc. 17 at pp. 3-4 (internal citation omitted)]. The Respondent confirms the accuracy of the Petitioner's assertion: "Petitioner is factually correct as to the events surrounding his petition for a writ of certiorari at the North Carolina Court of Appeals." [Doc. 19 at 2].

Neither the Petitioner nor the Respondent disclosed to the Court—before the entry of its Decision—any of the Petitioner's "supplemental" information filed with the state appellate court. Therefore, the Court's Decision, based upon all of the evidence before the Court at the time, was correct and accurate when entered on the Docket. The Petitioner's contention in his Rule 59(e) argument that "this Court's [Decision] overlooks certain key aspects of the state appellate court record which plainly reveal the error in this Court's ruling[,]" is factually inaccurate at best, and at worst, disingenuous. The Petitioner simply failed to file the pertinent documents as part of his forecast of evidence in response to the Respondent's motion.

Upon the Respondent's filing of her Motion for Summary Judgment, it was the Petitioner's obligation to place before this Court a sufficient forecast of evidence to demonstrate that the Respondent is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Petitioner failed to do so in that he failed to present evidence that preserved these issues in his certiorari petition before the North Carolina Court of Appeals. This alone was a sufficient basis to dismiss the Petitioner's Petition on these grounds.

Nonetheless, even considering the merits of the Petitioner's request for reconsideration, he fares no better. Under Rule 59(e), a court may alter or amend a judgment in four circumstances: (1) to accommodate an

intervening change in controlling law; (2) to account for new evidence not available at trial; (3) to correct a clear error of law; or (4) to prevent manifest injustice. None of these circumstances apply in this case. There has been no intervening change in the law since the Court issued its Decision. The additional evidence presented by the parties is not new and was clearly available before the § 2254 petition was filed. The Court's Decision was legally correct at the time of its entry, so no clear error of law requires correcting. And, regarding the fourth circumstance, because Grounds 3, 4, and 10, are meritless, as more fully discussed below, no manifest injustice will result by denying the Petitioner's motion under Rule 59(e).

## B. The Merits of Grounds 3, 4, and 10

As the Court explained in its Decision, it must first determine which state court decision is the relevant one to review for the purpose of applying 28 U.S.C. § 2254(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). That section of the AEDPA applies to "a person in custody under a state-court judgment who seeks a determination that the custody violates the Constitution, laws, or treaties of the United States." Rule 1(a)(1), 28 U.S.C. foll. § 2254. Normally, this poses no difficulty, but in this matter, both state decisions—the MAR court's dismissal and the appellate court's denial—failed to explain why those courts took the actions they did. Without

a "reasoned" decision to review, [w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Harrington v. Richter</u>, 562 U.S. 86, 99 (2011).

Accordingly, the Court presumes the state appellate court adjudicated Petitioner's three Grounds on the merits. With this in mind, and given that these three Grounds raise Sixth Amendment ineffective assistance of trial counsel challenges, the Court turns to the AEDPA and controlling precedent to evaluate the merits of Petitioner's three Grounds.

A federal court may not grant § 2254 relief as to any claim "adjudicated on the merits" in state court unless the state court's adjudication of such claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

<u>Id.</u> § 2254(d). As all Petitioner's Grounds reflect <u>Strickland</u>[2] claims, subsection 2254(d)(1) provides the appropriate basis to begin. It is critical,

---

[2] <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

11

at this juncture, that the Court recite the proper understanding and application of § 2254(d)(1)'s unreasonableness standard and of its operation in the context of a <u>Strickland</u> claim.

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> * * * * * * * * * * *
>
> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. … [§ 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

<u>Richter</u>, 562 U.S. at 101-02 (intern citations omitted).

To have been entitled to relief from the North Carolina Court of Appeals on his three Grounds, the Petitioner had to satisfy both of <u>Strickland</u>'s requirements that his counsel provided deficient assistance and that there was prejudice as a result. To show that an attorney failed to discharge her Sixth Amendment duty, a petitioner must establish that the attorney's

12

conduct "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Richter, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 690). Consequently, the Strickland test is not concerned with what the best lawyers would have done, or even what most good lawyers would have done.  The hurdle a petitioner must overcome is to show that no competent counsel would have taken the action that his counsel did take. If a petitioner surmounts this hurdle, he must next address the prejudice component.

In evaluating whether prejudice flowed from counsel's deficient acts or omissions, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is 'reasonably likely' the result would have been different."  Richter, 562 U.S. at 111 (intern citations omitted).  This is not a preponderance standard weighing whether it was more likely than not counsel's conduct altered the outcome.  "The likelihood of a different result must be substantial, not just conceivable." Id. at 112.

In the present matter, the state appellate court provided no reasons for denying the Petitioner's request for review of the trial court's MAR order. "Under § 2254(d), a habeas court must determine what arguments or

theories supported or, as here, could have supported, the state court's decision[.]" Id. at 102. If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal habeas court may not disturb a state-court decision denying the claim. Id. at 105.

### 1. Ground 3

In Ground 3, Petitioner argued his trial counsel provided ineffective assistance to him during his sentencing hearing when she failed to present mitigation evidence. [Doc. 9-16 at 53-6]. The Petitioner asserts his "MAR alleged and established that, had the sentencing court been presented with the substantial character evidence, [DE 3-1, pp. 1-12], and expert witness testimony regarding Petitioner's disability (autism), [DE 1-3, pp. 50-61], and informed about the truly mitigating nature of that disability in relation to Petitioner's conduct and moral culpability in this case, there is a reasonable probability that the sentencing court would have imposed a lesser sentence." [Doc. 13 at pp. 24-5].

First, the Petitioner refers to several letters he attached to his MAR describing in a positive light his character in the community [Doc. 3-1 at pp. 1-2], and alleged his "trial counsel presented no mitigation evidence at all, but rather only made cursory comments which were not evidence that could support the court's finding of a mitigating factor." [Doc. 13 at 24]. Petitioner's

14

state trial attorney, Ms. Ashley Cannon, in her own affidavit filed with the MAR court, disputed the Petitioner's allegations.

> During the sentencing hearing, I argued that he is a person of good character based on his volunteer work and community service. I offered that he has a support system in the community and pointed to the fact that his brother, mother, and wife were in court to support him. I also offered that he was gainfully employed. Those are [sentencing mitigating] factors 12, 18, and 19.

[Doc. 9-14 at 6]. The Petitioner's trial attorney's actions cannot be examined in isolation. As is typical in North Carolina's trial courts, when a defendant is convicted by either the court or a jury, sentencing proceeds immediately thereafter. Judges presiding over trials tend to have before them far more information concerning the now-convicted defendant than do judges who preside over guilty plea hearings. For that reason, defense counsel may be more succinct at their clients' sentencing proceedings. In this matter, the Petitioner's trial attorney pointed to the Petitioner's family members present during his trial, called the court's attention to his volunteer work in the community, and referenced his gainful employment. Some other defense attorney might have done more, such as provide a dozen letters of reference from friends, educators, and former employers. The standard, however, is not what the absolute best lawyers would have done. The statements in

mitigation made by Petitioner's counsel easily surpassed the competence threshold. That is all that is required.

Next, the Petitioner points to the affidavit provided by Dr. Laurie Sperry, a forensic psychologist with specialization in Autism, retained by the Petitioner for his MAR following his state convictions. [Doc. 1-3 at pp. 118-123]. Dr. Sperry did not perform any testing or otherwise conduct an evaluation of the Petitioner; she was hired to review certain trial transcripts from the Petitioner's state case and the Petitioner's medical records, including the diagnostic evaluation of the Petitioner conducted by Dr. Jemma Grindstaff in May 2014 which established his diagnosis of Autism Spectrum Disorder. [Doc. 1-3 at 118]. Dr. Sperry opined that the Petitioner's ASD diagnosis, while "not necessarily exculpatory, [it] does need to be considered within a legal context in terms of the characteristics associated with his developmental disability that reduced his culpability for the offense." [Id. at 123]. She further stated that, "[h]ad I been called to testify as an autism expert in this case, I would have spent time educating the court about the characteristics of Autism Spectrum Disorder and how these characteristics could provide context for Mr. Gibson's actions that preceded, occurred during and after the events of June 1, 2017." [Id.].

The Petitioner's trial attorney, however, strategically decided not to open the door on the issue of the Petitioner's diagnosis of Autism Spectrum Disorder. In her affidavit, Ms. Cannon testified:

> Mr. Gibson expressed to me that he believed he had autism in my discussions with him. In my work on this case, I requested that Mr. Gibson provide me with a report from a mental health professional to evaluate whether or not we should use an expert in this case. He submitted a report to me from Jemma Grindstaff, PhD. I found that Dr. Grindstaff described things that would be detrimental to Mr. Gibson if she was used as an expert witness on autism. She stated that Mr. Gibson was fascinated by nooses when he was younger; he exploded in violent angry outbursts routinely; he threatened to stab his brother, and he was violent. He was hospitalized at Dorothea Dix for a total of nine months when he was younger. She described him as having "no filter" and "no regard for others' feelings." She stated that he is a person of very high intelligence. I did not think it was a good trial strategy to have Dr. Grindstaff testify as an expert witness as that would necessarily mean that I would have to turn over her report and she would be subject to cross-examination.

[Doc. 9-14 at pp. 6-7]. Given the facts adduced at trial concerning the Petitioner's demeanor while driving, his hand gestures made to the motorcyclists, and his mannerisms in operating the van and its trailer the afternoon of June 1, 2017, Ms. Cannon's decision to forego calling Dr. Grindstaff or otherwise attempting to leverage her diagnostic report was eminently reasonable. Considering the facts of the case, to do otherwise might be considered malpractice. The trial court concluded there was no ineffectiveness on Ms. Cannon's part in representing the Petitioner at

sentencing and the state appellate court summarily affirmed this conclusion in denying the Petitioner's request for review. This Court finds the state courts' application of the <u>Strickland</u> standard was reasonable with regard to Ground 3.

### 2. Ground 4

In Ground 4, the Petitioner argued his trial counsel provided ineffective assistance to him when she failed to use certain photographs to impeach one of the state's witnesses. [Doc. 9-16 at pp. 40-1]. According to the Petitioner, witness Timothy Snook gave damaging testimony at trial. Snook testified that he was driving alongside the tractor-trailer driven by another witness, Dwaine Haskins, when he observed the Petitioner abruptly pull in front of Sumrell's motorcycle and put on his brakes, causing Sumrell's motorcycle to wreck. Snook testified that immediately after the wreck he parked right in front of Haskins' tractor-trailer. [Doc. 9-10 at 30]. The photographs, however, did not show Snook's vehicle parked there. The Petitioner argues that this, taken with Haskins' testimony that he did not remember seeing Snook's truck, tended to show that Snook was not in a position to observe the accident. [<u>Id.</u> at 30-31]. From this the Petitioner concludes that the photographs were crucial to discrediting Snook, and

failure to use them was ineffective assistance.  The Petitioner, however, greatly overstates the evidentiary weight of these photographs.

None of these photographs have time stamps.  Accordingly, the record is silent as to the amount of time that had elapsed between the time of the wreck and when the photos were taken.  Snook's truck could have been moved.[3]  More importantly, any discrepancy regarding its location after the wreck had nothing to do with where Snook was positioned on the highway at the time of the wreck and what he observed from that position.  The evidentiary value of the photographs is so remote that their admissibility is questionable.  Failure to offer them was not ineffective assistance.  The North Carolina courts' application of the <u>Strickland</u> standard to counsel's performance as alleged in Ground 4 was reasonable.

### 3.    Ground 10

In Ground 10, Petitioner argued his trial counsel provided ineffective assistance to him when she failed to cross examine the state's witness Glenn Alphin regarding his pretrial statements made to the prosecution.  [Doc. 9-16

---

[3] The Petitioner's accident reconstruction expert, retained after his trial, testified in his affidavit that "[t]here is photographic evidence of a mid-sized grey truck behind a second tractor trailer after the accident.  It cannot be determined for certain whether that is the Snook vehicle."  [Doc. 1-3 at 84].

19

at 44-5].  The Petitioner alleged in his MAR that Alphin purportedly[4] told prosecutor Elizabeth Floyd that he "lost Sarah in mirror after she got thrown off."  In support of this claim, the Petitioner asserts:

> [I]f Alphin could not see Sarah in his mirror and Sumrell and his motorcycle were laid out on the shoulder of the highway, then it is equally likely that Petitioner would not have been able to see that Sarah was lying on the highway as he drove down the highway after the accident.

[Doc. 3 at 33].  In other words, the Petitioner posits that if Alphin could not see the victim fall to the highway, then it is plausible that the Petitioner did not see it either.  Given their different vantage points, this argument is pure speculation.  [Doc. 9 at 30].

More importantly, the context of Alphin's statement was more detrimental to the Petitioner than helpful.  As a part of its case in chief, the state had to prove that the Petitioner knew his vehicle was involved in a crash and that serious injury or death resulted.  State v. Gibson, 276 N.C. App. 230, 237, 855 S.E.2d 533, 538 (2021) (discussing elements of N.C. Gen. Stat. § 20-166(a)).  Immediately following the subject statement, Alphin said

---

[4] The quoted phrase is taken from a hand-written piece of paper [Doc. 1-3 at 96] that the parties seemingly agree was written by prosecutor Elizabeth Floyd in preparation for the Petitioner's trial. This writing does not identify the source or sources of the information supplied, whether any of the factual descriptions set forth therein are verbatim quotes, or whether any of the factual descriptions contained in the writing may have been Ms. Floyd's personal conclusions based upon information provided by a person or persons with whom she spoke.

"as soon as bike went to sliding van takes off." [Doc. 1-3 at 96]. Any reference to Alphin's full statement would have put before the jury the damaging evidence of the Petitioner's consciousness of having caused the collision, as he sped off upon seeing the motorcycle go down.

As with Grounds 3 and 4, the Petitioner, with regard to Ground 10, has failed to show that no competent counsel would have taken the action that his counsel did take. There was much to lose, and little, if anything, to gain by the Petitioner's trial counsel conducting a cross-examination of Alphin regarding his purported pre-trial statement to the prosecutor. Because there exist reasonable arguments that counsel satisfied Strickland's deferential standard with regard to the Petitioner's claims as contained in Grounds 3, 4, and 10, this habeas Court will not disturb the state courts' decisions denying any of these claims.

## V. CONCLUSION

For the reasons set forth above, the Court concludes that the Petitioner has failed to show that any of the grounds for reconsideration under Rule 59(e) apply. In addition, even if the Court reconsiders the matter on the grounds the Petitioner now asserts, the claims contained in Grounds 3, 4, and 10 of the § 2254 petition were properly denied on the merits, and the § 2254 petition was properly dismissed.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability. 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (noting that, in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (holding that, when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Petitioner's Motion To Alter or Amend Judgment pursuant to Federal Rule of Civil Procedure 59(e) [Doc. 17] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court **DECLINES** to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk of Court is respectfully directed to terminate this case.

22

**IT IS SO ORDERED.**

Signed: June 25, 2026

Martin Reidinger
Chief United States District Judge

23